## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, RYAN P. DONAHUE, a Special Agent with the Drug Enforcement Administration, being duly sworn according to law, hereby state that the facts set forth in this affidavit are true and correct to the best of my knowledge, information, and belief:

### INTRODUCTION AND AGENT BACKGROUND

1.      Your Affiant is a Special Agent with the Drug Enforcement Administration ("DEA").  As a Special Agent with the DEA, I am authorized, pursuant to 21 U.S.C. § 878, to conduct investigations, to execute search warrants, and to make arrests for any offense against the United States.  I am a "Federal Law Enforcement Officer" within the meaning of FED.R.CRIM.P. 41(a)(2)(C).

2.      I have been a special agent with the DEA since March 2016. Before that, I worked from November 2012 to March 2016 as a Senior Officer Specialist with the Federal Bureau of Prisons. During my career, I have participated in numerous drug trafficking investigations during the course of which I have (a) conducted electronic and physical surveillance; (b) debriefed and managed witnesses, cooperators and confidential sources of information who have been involved in drug trafficking and money laundering; (c) monitored wiretapped conversations of individuals committing drug trafficking and money laundering schemes and reviewed line sheets prepared by wiretap monitors; (d) worked in an undercover capacity to gather information about drug trafficking and money laundering; (e) executed search warrants at locations where records and evidence of drug trafficking and money laundering have been found; (f) and reviewed and analyzed organization records, including telephone records, bank records, records kept and maintained by drug traffickers, and property records. My experience is not limited to drug investigations. I also have extensive experience participating in complex investigations into violent street gangs.

3.      I have had experience, training, and communication with other law enforcement personnel who specialize in the area of illegal drug trafficking and documentation and the detection of proceeds from drug trafficking. Your affiant also has experience in debriefing defendants and informants as witnesses who have personal knowledge of drug trafficking organizations. Such individuals often have personal knowledge regarding the methods, transportation, and distribution of the drugs and money in large scale controlled substance distribution operations.

4.      This affidavit is submitted for the limited purpose of securing an arrest warrant. As such, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth facts that I believe are necessary to establish probable cause to believe that the Defendants, (1) Marco Antonio **CORNEJO-CERECEDA,** (2) Jesus Alberto **NAPOLES PONCE DE LEON,** (3) Baldemar Eduardo **ORTIZ DE LA FUENTE,** and (4) Alfonso Alexis **MACIAS- ITURRALDE**, violated 21 U.S.C. § 846 (Narcotics Conspiracy) and 21 U.S.C. § 841(a)(1), (b)(1)(C) (Possession with Intent to Distribute a Controlled Substance (Cocaine)), and further, that the Defendants (3) Baldemar Eduardo **ORTIZ DE LA FUENTE,** and (4) Alfonso Alexis **MACIAS- ITURRALDE**, violated 18 U.S.C. § 924(c)(1)(A)(i) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime).

5.      The information contained within this affidavit is based on my training and experience, my personal knowledge, observations, and experience, including information of which I am personally aware by virtue of my participation in this investigation, my review of investigative reports, intelligence reports, interviews, and debriefings with participating officers, agents, and cooperating witnesses, and information imparted to me by other law enforcement officers involved in this investigation. I have spoken with other DEA Special Agents and Task Force Officers about this and other similar cases, and I have spoken with narcotics experts regarding methods of

2

operation utilized by subjects who distribute, manufacture, traffic, and/or sell controlled substances. Furthermore, I receive training on a daily basis working on drug investigations for DEA in the Denver, Colorado Division Office. I have also spoken with other DEA Special Agents, Task Force Officers, and Intelligence Analysts regarding the technological devices, tools, and methods used by subjects that traffic and distribute controlled substances.

6.     Based on the facts set forth in this affidavit, there is probable cause to believe that on or about November 25, 2019, to on or about December 10, 2019, in the State and District of Colorado, the Defendants, (1) Marco Antonio **CORNEJO-CERECEDA,** (2) Jesus Alberto **NAPOLES PONCE DE LEON,** (3) Baldemar Eduardo **ORTIZ DE LA FUENTE,** and (4) Alfonso Alexis **MACIAS- ITURRALDE**, knowingly and intentionally violated 21 U.S.C. § 846 by conspiring together and with unknown co-conspirators to violate federal drug trafficking laws, specifically 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute 500 Grams or More of a Mixture or Substance Containing a Detectable Amount of Cocaine), and further, on or about December 10, 2019, in the State and District of Colorado, the Defendants, (1) Marco Antonio **CORNEJO-CERECEDA,** (2) Jesus Alberto **NAPOLES PONCE DE LEON,** (3) Baldemar Eduardo **ORTIZ DE LA FUENTE,** and (4) Alfonso Alexis **MACIAS- ITURRALDE**, knowingly and intentionally violated 21 U.S.C. § 841(a)(1), (b)(1)(C) (Possession with Intent to Distribute a Controlled Substance (Cocaine)), and finally, that on or about December 10, 2019, in the State and District of Colorado, the Defendants (3) Baldemar Eduardo **ORTIZ DE LA FUENTE,** and (4) Alfonso Alexis **MACIAS- ITURRALDE**, knowingly and intentionally violated 18 U.S.C. § 924(c)(1)(A)(i) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime).

## INVESTIGATION AND PROBABLE CAUSE

**I.**    **Background of Investigation and November 27, 2019 Attempted Cocaine Transaction**

7.     On November 25, 2019, the United States of America, including the DEA, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), U.S. Marshals Service, Denver Police Department, and other law enforcement, began conducting a criminal investigation of suspected cocaine trafficking and distribution activities of the Defendants, (1) Marco Antonio **CORNEJO-CERECEDA,** (2) Jesus Alberto **NAPOLES PONCE DE LEON,** (3) Baldemar Eduardo **ORTIZ DE LA FUENTE,** and (4) Alfonso Alexis **MACIAS- ITURRALDE,** and other unknown co-conspirators, in the Denver, Colorado area.

8.     On November 25, 2019, at approximately 12:31 p.m., a Denver Police Department Confidential Source (hereafter referred to as the "CS"), began communicating via telephone number: 720-209-5675 with Marco **CORNEJO-CERECEDA** arranging for the purchase and sale of two kilograms of cocaine. The CS had arranged to purchase two kilograms of cocaine from **CORNEJO-CERECEDA** for $27,000 per kilogram. Through telephone communication with **CORNEJO-CERECEDA** the CS was informed that **CORNEJO-CERECEDA**'s source of supply had just received a ten kilogram cocaine shipment from Mexico. **CORNEJO-CERECEDA** also informed the CS that his source was planning on returning to Mexico and wanted to complete the transaction with the CS as soon as possible. Shortly after the telephone communication, the CS called Denver PD Detective Conley and advised him of the text message and phone conversation he/she had with **CORNEJO-CERECEDA**.

9.     On November 27, 2019 at approximately 10:07 a.m., the CS was instructed to make a recorded call with **CORNEJO-CERECEDA** at telephone number 720-209-5675 to establish a

4

meeting place to conduct the two kilogram cocaine transaction and the discuss details surrounding it. The following is a synopsis of the recorded call and is not an exact transcription or exact account of all the content discussed throughout the call. During the call, the CS learned that **CORNEJO-CERECEDA** was no longer willing to source the CS with two kilograms, but rather one kilogram of cocaine for $28,000. The CS also learned that **CORNEJO-CERECEDA**'s friend, Jesus **NAPOLES PONCE DE LEON** a/k/a "Sergeant" would be "middling" the transaction between **CORNEJO-CERECEDA** and the cocaine source of supply, later identified as Baldemar **ORTIZ DE LA FUENTE** a/k/a "Guerro."

10.     At approximately 11:45 a.m., law enforcement established surveillance at the Home Depot located at 550 S. Santa Fe Drive, Denver, Colorado, in anticipation for the one kilogram cocaine transaction with **CORNEJO-CERECEDA** and **NAPOLES PONCE DE LEON**.

11.     At approximately 11:50 a.m., the CS and his/her vehicle were searched for contraband by Denver PD, Narcotics Detective Conley as witnessed by SA Donahue with negative results. The CS was subsequently provided with a recording device to maintain on his/her person while the CS set up the one kilogram cocaine transaction with **CORNEJO-CERECEDA** and **NAPOLES PONCE DE LEON**.

12.     At approximately 11:57 a.m., the CS was instructed to make a recorded call with **CORNEJO-CERECEDA** at telephone number 720-209-5675 and advise him that the CS had arrived in the area and determine where to meet him at the Home Depot. The following is a synopsis of the recorded call and is not an exact transcription or exact account of all the content discussed throughout the call.  During the phone call, the CS was informed that **CORNEJO-CERECEDA** and **NAPOLES PONCE DE LEON** would be arriving in separate vehicles and

5

that the source, **ORTIZ DE LA FUENTE,** would be arriving in another. The CS was then instructed to go into the Home Depot and to purchase something. The CS was told that **NAPOLES PONCE DE LEON** was approximately seven-ten minutes away from the Home Depot.

13.    At approximately 12:10 p.m., the CS entered the Home Depot and was greeted by **CORNEJO-CERECEDA**, **NAPOLES-PONCE DE LEON** and Unknown Hispanic Male (UHM1**).** Surveillance was maintained as the CS, **CORNEJO-CERECEDA**, **NAPOLES-PONCE DE LEON** and UHM1 discussed conducting the one kilogram transaction.

14.    At approximately 12:56 p.m., the CS exited the Home Depot and went to his/her vehicle located on the northside of the parking lot. At approximately 12:56 p.m., Denver PD Detective Rogers observed **CORNEJO-CERECEDA**, **NAPOLES-PONCE DE LEON** and UHM1 exit the Home Depot and walk towards the west side of the parking lot and stop in the area of the CS's vehicle.  Over the course of the next several minutes, **CORNEJO-CERECEDA** engaged the CS in conversation through the CS's driver side window of the CS's vehicle. At approximately 1:04 p.m., **CORNEJO-CERECEDA**, **NAPOLES-PONCE DE LEON** and UHM1 departed the area in **CORNEJO-CERECEDA**'s vehicle, a 2015 GMC Sierra Pickup Truck, Colorado Registration: CMC-574.

15.    At approximately 2:38 p.m., the CS received a telephone call from **CORNEJO-CERECEDA** at telephone number 720-209-5675. The following is a synopsis of the recorded call and is not an exact transcription or exact account of all the content discussed throughout the call. During the call, **CORNEJO-CERECEDA** informed the CS that the cocaine source was unable to conduct the transaction until approximately 4:30 p.m. or 5:00 p.m., that day. Surveillance and the operation was subsequently terminated a short time after the telephone call.

**II.      Subsequent Investigation and December 10, 2019 Two Kilogram Cocaine Seizure**

16.      On December 2, 2019, at approximately 10:00 a.m., the CS placed a call to **CORNEJO-CERECEDA** at telephone number 720-209-5675 to establish a meeting place to conduct the two kilogram cocaine transaction and the discuss details surrounding the transaction. The following is a synopsis of the recorded call and is not an exact transcription or exact account of all the content discussed throughout the call. The CS asked **CORNEJO-CERECEDA** if they would be ready to do the cocaine deal early the next day. **CORNEJO-CERECEDA** said they would be ready to do the deal at about noon.  Ultimately, however, the transaction did not occur December 3, 2019.

17.      On December 5, 2019, the CS received a telephone call from **CORNEJO-CERECEDA,** who apologized to the CS and stated that he had lost his phone. **CORNEJO-CERECEDA** then offered to conduct the transaction with the CS on Friday, December 6, 2019, but the CS insisted that they conduct the transaction on Monday, December 9, 2019, or Tuesday, December 10, 2019.

18.      On December 10, 2019, at approximately 11:00 a.m., the CS received a call from **CORNEJO-CERECEDA** and **NAPOLES-PONCE DE LEON** stating that they had two kilograms of cocaine for sale, and sent the address 1540 Tabor Street, Lakewood, Colorado, as an address where they wanted to conduct the transaction.

19.      At approximately 11:30 a.m., the CS had a recorded call with **CORNEJO-CERECEDA**. The following is a synopsis of the recorded call and is not an exact transcription or exact account of all the content discussed throughout the call. The CS asked **CORNEJO-CERECEDA** where he was. **CORNEJO-CERECEDA** told the CS he was going to pick the guy up and jump on I-70.  The CS told **CORNEJO-CERECEDA** he would be at the deal location in

45 minutes and asked **CORNEJO-CERECEDA** why they couldn't do the transaction closer to the CS's house. **CORNEJO-CERECEDA** told the CS everyone was ready to do the deal at the prearranged location.

20.     At approximately 12:30 p.m., the CS placed a recorded call to **CORNEJO-CERECEDA**. The following is a synopsis of the recorded call and is not an exact transcription or exact account of all the content discussed throughout the call.  **CORNEJO-CERECEDA** told the CS that one of the people that is going to participate in the cocaine deal can't move away from his construction site.  This individual is believed to be **NAPOLES PONCE DE LEON**, based on information set forth herein. The CS asked **CORNEJO-CERECEDA** if the deal location was safe, and **CORNEJO-CERECEDA** stated that it was, and that it was next to a church and a construction site.  The CS told **CORNEJO-CERECEDA** that he was leaving Ft. Morgan, and **CORNEJO-CERECEDA** said he would see the CS at the deal location.

21.     At approximately 1:30 p.m., the CS placed a recorded call to **CORNEJO-CERECEDA**. The following is a synopsis of the recorded call and is not an exact transcription or exact account of all the content discussed throughout the call.  The CS told **CORNEJO-CERECEDA** that he just counted the money, and that he was leaving on the freeway from Ft. Morgan and he was about one hour away. The CS asked **CORNEJO-CERECEDA** if he had it (meaning the cocaine), and stated that he wanted to complete the transaction quickly.  **CORNEJO-CERECEDA** confirmed and agreed.

22.     At approximately 2:00 p.m., law enforcement established surveillance at 1540 Tabor Street, Lakewood, Colorado, in anticipation for the two kilogram cocaine transaction with **CORNEJO-CERECEDA** and **NAPOLES PONCE DE LEON**. The residence located at 1540

Tabor Street, Lakewood, Colorado, appeared to be under construction at that time, consistent with what **CORNEJO-CERECEDA** told the CS previously.

23.     During this time, Denver PD Detective Vance observed a 2015 Black GMC Sierra Pickup Truck, Colorado Registration: CMC-574, in the area of the deal location.  This was the same vehicle utilized by **CORNEJO-CERECEDA** during the November 27, 2019 meeting with the CS.  Detective Vance observed this vehicle parked in the parking lot of the Grace Bible Church located at 1545 Tabor Street, Lakewood, Colorado. The Grace Bible Church is located directly across the street from the residence/construction site located at 1540 Tabor Street, Lakewood, Colorado.

24.     At approximately 2:20 p.m., the CS and his/her vehicle were searched for contraband by Denver PD, Narcotics Detective Conley as witnessed by SA Donahue with negative results. The CS was subsequently provided with a recording device to maintain on his/her person while the CS set up the two kilogram cocaine transaction with **CORNEJO-CERECEDA** and **NAPOLES PONCE DE LEON.**

25.     At approximately 2:39 p.m., the CS received an incoming call from **CORNEJO-CERECEDA**.  During the call, **CORNEJO-CERECEDA** instructed the CS to wait for him to call before he arrived at the deal location, 1540 Tabor Street, Lakewood, Colorado. Based on your Affiant's experience conducting large scale international and domestic drug investigations, your Affiant knows that individuals that "middle" drug transactions try their best to avoid having the customer meet the source of supply, out of fear that they would be cut out of the transaction in the future and lose money. Your Affiant believes that **CORNEJO-CERECEDA** was purposely and intentionally trying to prevent the CS from seeing the source of supply, and trying to avoid the CS seeing the vehicle in which the source of supply arrived to the deal.

9

26.     At approximately 2:51 p.m., **CORNEJO-CERECEDA** called the CS and told the CS that the cocaine source had just arrived, and instructed the CS to meet him at 1540 Tabor Street, Lakewood, Colorado.

27.     At approximately 2:54 p.m., Denver PD Detective Rogers observed a 2003 Grey GMC Yukon, Colorado Registration: UOB-449, arrive and park directly in front of 1540 Tabor Street, Lakewood, Colorado.  Detective Rogers observed two individuals in the vehicle at this time, one male in the driver's seat, later identified to be **ORTIZ DE LA FUENTE**, and one male in the front passenger seat, later identified as M.E.M.M.

28.     At approximately 3:00 p.m., the CS place an outgoing recorded call to **CORNEJO-CERECEDA**. The following is a synopsis of the recorded call and is not an exact transcription or exact account of all the content discussed throughout the call.  The CS told **CORNEJO-CERECEDA** he/she was Colfax and Sheridan and about to arrive. **CORNEJO-CERECEDA** told the CS he was about to arrive also. The CS told **CORNEJO-CERECEDA** to let him know when **CORNEJO-CERECEDA** was at the deal location and that the CS would arrive soon after.  Based on surveillance at the deal location, your Affiant knows that **CORNEJO-CERECEDA** was already present at the deal location, and may have been concealing this from the CS as a further attempt to prevent the CS from meeting the source of supply.

29.     At approximately 3:08 p.m., Denver PD Detective Rogers observed the CS arrive in the area where the two kilogram cocaine transaction was to take place. Detective Rogers observed the CS park in the Grace Bible Church parking lot, to the east of **CORNEJO-CERECEDA**'s vehicle. The CS subsequently entered **CORNEJO-CERECEDA**'s vehicle, the 2015 Black GMC Sierra Pickup Truck described herein. While speaking with **CORNEJO-**

CERECEDA inside of CORNEJO-CERECEDA's vehicle, the CS was informed by CORNEJO-CERECEDA that the cocaine had not yet arrived.

30.     At approximately 3:27 p.m., Detective Rogers observed **NAPOLES PONCE DE LEON** walk from the construction site area of 1540 Tabor Street, Lakewood, Colorado, over to **CORNEJO-CERECEDA**'s vehicle and briefly talk to him before walking back to 1540 Tabor Street, Lakewood, Colorado.  This location is believed to be the jobsite where **NAPOLES PONCE DE LEON** was working at the time.  At approximately 3:51 p.m., Detective Rogers again observed **NAPOLES PONCE DE LEON** walk over to **CORNEJO-CERECEDA**'s vehicle and engage the CS in conversation through the passenger side window where the CS was seated. During these conversations, the CS learned that the individuals seated in the 2003 Grey GMC Yukon parked nearby, **ORTIZ DE LA FUENTE** and M.E.M.M., were the sources of supply for the transaction, and that they were waiting on couriers to arrive at the location with the two kilograms of cocaine.

31.     At approximately 4:37 p.m., Detective Rogers observed **NAPOLES PONCE DE LEON** come out of the residence/construction site located at1540 Tabor Street, Lakewood, Colorado and enter **CORNEJO-CERECEDA**'s vehicle. Several minutes later, **NAPOLES PONCE DE LEON** exited the vehicle.

32.     At approximately 4:47 p.m., Detective Rogers observed the 2003 Grey GMC Yukon pull into the parking lot of the Grace Bible Church and park in a parking spot directly to the west of **CORNEJO-CERECEDA**'s vehicle.

33.     At approximately 4:50 p.m., M.E.M.M., while still inside of the 2003 Grey GMC Yukon, cut into a kilogram of cocaine, then subsequently handed that kilogram of cocaine to **NAPOLES PONCE DE LEON**, who as standing between the two vehicles.  **NAPOLES PONCE DE LEON** passed the kilogram of cocaine to **CORNEJO-CERECEDA,** who subsequently

passed it to the CS.  The CS was then instructed to go retrieve the money ($27,000 per kilogram, $54,000 total) to complete the transaction before the second kilogram of cocaine was provided. The CS then gave the predetermined arrest signal.

34.     At approximately 4:51 p.m., law enforcement officers arrived in the parking lot with emergency equipment activated, which consisted of lights and sirens, while clearly wearing police gear that stated "DEA/Police" "US Marshals/Police" "Denver Police." As your Affiant exited his law enforcement vehicle and began giving verbal commands to the occupants of the 2003 Grey GMC Yukon, your affiant observed **ORTIZ DE LA FUENTE** in the front driver's seat of the vehicle. Your Affiant also observed that the front passenger seat was not occupied; however the back seat had three occupants (Later identified as M.E.M.M., a male later identified as J.L.C. and **MACIAS-ITURRALDE**).

35.     Immediately as your Affiant began giving verbal commands to the occupants of the 2003 Grey GMC Yukon to show their hands. Your Affiant observed **NAPOLES-PONCE DE LEON** flee the area on foot along a chain linked fence to the north of the Grace Bible Church. During this time, **ORTIZ DE LA FUENTE** also opened the driver's door of the 2003 Grey GMC Yukon and attempted to flee the area on foot. Your Affiant pursued **NAPOLES-PONCE DE LEON** on foot as your Affiant continued to give him verbal commands to stop running and show his hands. Your Affiant subsequently apprehended **NAPOLES-PONCE DE LEON**. DEA Special Agent Moham also apprehended **ORTIZ DE LA FUENTE** shortly after he fled the vehicle.

36.     During this time, the backseat passengers of the 2003 Grey GMC Yukon, M.E.M.M., J.L.C., and **MACIAS-ITURRALDE** were detained without incident. Your Affiant noted that as law enforcement officers ordered M.E.M.M., J.L.C., and **MACIAS-ITURRALDE** out the back of the 2003 Grey GMC Yukon, two black colored backpacks had fallen out of the

rear seat of the vehicle. **CORNEJO-CERECEDA** was also detained from his vehicle, the 2015 black GMC Sierra, without incident.

37.     Officers subsequently conducted a search of both vehicles.  During a search of the 2003 grey GMC Yukon, your Affiant located one kilogram of suspected cocaine with a total weight of 1184.1 gross grams, which was sitting on the driver's side floorboard, in the immediate area of **ORTIZ DE LA FUENTE** prior to him fleeing from the driver seat of the vehicle. In between the front passenger seat and the center console, Task Force Officer Richards located a 10 mm Glock Handgun, and a suspected drug ledger on the front passenger floorboard. This firearm was loaded with fifteen rounds of ammunition in the magazine; however, there was no round in the chamber of the firearm. Your Affiant knows based on his training and experience conducting complex drug investigations that drug traffickers commonly carry firearms or store firearms in close proximity to themselves in the course of drug trafficking in order to protect themselves from being robbed, protect their drugs and their drug proceeds.

38.     Further, inside of the 2003 grey GMC Yukon, Denver PD Detective Vance also located two plastic grocery bags in the rear seat pouch of the driver's side seat.  This was directly in front of the seat in which **MACIAS-ITURRALDE** had been sitting immediately prior to law enforcement contact.  These plastic grocery bags had been ripped up and reused in order to hold and conceal thirty five (35) individual plastic baggies of suspected cocaine with a total weight of 50.3 gross grams. Your Affiant knows, based on his training and experience, that thirty five (35) individual plastic baggies of cocaine were packaged in such a manner that they would be sold in street level narcotics sale. Underneath the driver side rear seat, at the feet of the seat where **MACIAS-ITURRALDE** was seated, Detective Vance also located a Ruger .45 caliber semi-

13

automatic handgun, with one round of ammunition in the chamber and two additional rounds of ammunition in the magazine.

39.     During a search of **CORNEJO-CERECEDA's** vehicle, the 2015 black GMC Sierra, DEA Special Agent Pizzino located one kilogram of suspected cocaine, with a total weight of 1334.9 gross grams, inside of an off white colored plastic bag, located on the rear passenger side floorboard.

## III.     Post-Arrest Interviews

### a.     Post-Arrest Interview of ORTIZ DE LA FUENTE

40.     At approximately 12:00 a.m. on December 10, 2019 to December 11, 2019, your Affiant and DEA Special Agent Campbell conducted a post arrest interview with **ORTIZ DE LA FUENTE**. **ORTIZ DE LA FUENT**E was advised of his *Miranda* rights by reading these rights in the Spanish language, acknowledged he understood those rights, and stated he was willing to waive those rights and answer questions without an attorney present. The following is a synopsis of that interview and is not a comprehensive summary of all statements made or information shared with investigators.

41.     **ORTIZ DE LA FUENTE** told investigators that he had been working as a house painter for the past three months and stated that he was working on residence across the street from where he was arrested. Investigators asked **ORTIZ DE LA FUENTE** why there was a kilogram of cocaine on the driver's floorboard of the vehicle where he had been sitting and gun next to him in the console of the vehicle and **ORTIZ DE LA FUENTE** stated they must have thrown them on me.  **ORTIZ DE LA FUENTE** went on to say that one of the guns belonged to his friend but he wasn't going to give names. **ORTIZ DE LA FUENTE** then changed his account and stated that he saw **MACIAS-ITURRALDE** with a black handgun in his possession. **ORTIZ DE LA**

FUENTE stated that he believed that **MACIAS-ITURRALDE** would have the most knowledge about the cocaine deal out of people that were detained.

42.     **ORTIZ DE LA FUENTE** stated that at one point, several people entered the 2003 grey GMC Yukon, and he asked them what they were doing. According to **ORTIZ DE LA FUENTE,** they told him they were going to do a drug deal. **ORTIZ DE LA FUENTE** stated that he was stupid to continue to stay seated in the driver's seat but that he was not a participant in the drug deal.  **ORTIZ DE LA FUENTE** stated that prior to his arrest, a white van arrived in the area of the transaction, and he saw **MACIAS-ITURRALDE** and J.LC. exit the van, and that each of them was carrying a backpack.  Investigators did view a white van while on surveillance, which was parked a few houses up the street from where the parking lot where the arrests occurred.

43.     At first, **ORTIZ DE LA FUENTE** stated that he didn't know whose vehicle he was sitting in and was only in the vehicle because he wanted to see how it felt to sit in the driver's seat and that it was a case of wrong place and wrong time. Later, **ORTIZ DE LA FUENTE** stated that he actually owned the vehicle and was currently making payments on it.

b. Post-Arrest Interview of NAPOLES-PONCE DE LEON

44.     At approximately 1:15 a.m. on December 11, 2019, your Affiant and SA Campbell conducted a post arrest interview with **NAPOLES-PONCE DE LEON**. **NAPOLES-PONCE DE LEON** was advised of his *Miranda* rights by reading these rights in the Spanish language, acknowledged he understood those rights, and stated he was willing to waive those rights and answer questions without an attorney present. The following is a synopsis of that interview and is not a comprehensive summary of all statements made or information shared with investigators.

45.     **NAPOLES-PONCE DE LEON** stated that he had met a cocaine supplier, later identified as Baldemar **ORTIZ DE LA FUENTE**, about five months prior at the Guadalajara

Sports Bar located at 2895 W. 72nd Avenue, Westminster, Colorado. **NAPOLES-PONCE DE LEON** stated that he was a frequent cocaine user and that when he met **ORTIZ DE LA FUENTE** he offered to sell **NAPOLES-PONCE DE LEON** $20 bags of cocaine for his personal use. **NAPOLES-PONCE DE LEON** stated that he bought user amounts of cocaine from **ORTIZ DE LA FUENTE** on about six different occasions. **NAPOLES-PONCE DE LEON** stated that when he would purchase cocaine from **ORTIZ DE LA FUENTE** that it was typically two grams bags. **NAPOLES-PONCE DE LEON** also stated that **ORTIZ DE LA FUENTE** was known to walk around the Guadlajara Sports Bar with a "fanny pack" style bag that contained additional quantities of cocaine for retail distribution inside the bar. **NAPOLES-PONCE DE LEON** stated that about a month ago, **ORTIZ DE LA FUENTE** told **NAPOLES-PONCE DE LEON** that he could supply kilogram quantities of cocaine.

46.     **NAPOLES-PONCE DE LEON** stated that several weeks prior to his arrest an individual known to him as "Marco," later identified as Marco Antonio **CORNEJO-CERECEDA**, asked **NAPOLES-PONCE DE LEON** if he knew someone that could supply kilogram quantities of cocaine in Denver, Colorado. According to **NAPOLES-PONCE DE LEON**, **CORNEJO-CERECEDA** was looking to broker a cocaine transaction for another individual (the CS).

47.     **NAPOLES-PONCE DE LEON** stated that several weeks prior to his arrest, he contacted **ORTIZ DE LA FUENTE** and told him that he (**NAPOLES-PONCE DE LEON**) had a buyer that wanted to purchase one kilogram of cocaine (the CS). **NAPOLES-PONCE DE LEON** stated that **ORTIZ DE LA FUENTE** agreed to sell one kilogram of cocaine to **CORNEJO-CERECEDA** and the buyer (the CS) for $26,500. **NAPOLES-PONCE DE LEON** stated that he and **CORNEJO-CERECEDA** would sell the kilogram of cocaine to the buyer (the

CS) for $27,000 and that **NAPOLES-PONCE DE LEON** and **CORNEJO-CERECEDA** would split the additional $500.

48.     **NAPOLES-PONCE DE LEON** stated that two weeks earlier (on or about November 27, 2019), **CORNEJO-CERECEDA** and the buyer (the CS) attempted to conduct a one kilogram cocaine transaction in a Home Depot parking lot, but that **ORTIZ DE LA FUENTE** was running late and the transaction did not occur.

49.     **NAPOLES-PONCE DE LEON** stated that on the day of his arrest, he was in contact with **ORTIZ DE LA FUENTE** and **CORNEJO-CERECEDA**, and that he had arranged to broker a two kilogram cocaine transaction for $26,500 per kilogram ($53,000 in total).  In turn, he and **CORNEJO-CERECEDA** would charge the buyer (the CS) $27,000 per kilogram of cocaine (for a total of $54,000) and that **NAPOLES-PONCE DE LEON** and **CORNEJO-CERECEDA** would split the additional $1,000. He stated that they agreed to conduct the two kilogram cocaine deal at **NAPOLES-PONCE DE LEON´s** job site.

50.     **NAPOLES-PONCE DE LEON** stated that a grey GMC Yukon (the same 2003 grey GMC Yukon observed by investigators) arrived at his job site and that **ORTIZ DE LA FUENTE** was driving the vehicle, and that there was an individual sitting in the passenger's seat, identified by investigators as M.E.M.M.  **NAPOLES-PONCE DE LEON** stated that when he approached the driver's side of the 2003 grey GMC Yukon, he saw **ORTIZ DE LA FUENTE** in the driver's seat and that he observed a handgun sticking out of the cup holder in the console next to **ORTIZ DE LA FUENTE**. **NAPOLES-PONCE DE LEON** stated that M.E.M.M was speaking to somebody on his telephone and that it sounded like M.E.M.M. was directing someone to meet at the job site. **NAPOLES-PONCE DE LEON** stated that **ORTIZ DE LA FUENTE** told

NAPOLES-PONCE DE LEON that he didn't have the cocaine with him but that someone was about to arrive with it.

51.     **NAPOLES-PONCE DE LEON** stated that a white van arrived, and that two males exited the van, and that both males were carrying backpacks. The individuals that exited the van were later identified by investigators as Alfonso Alexis **MACIAS-ITURRALDE**, and J.L.C. **NAPOLES-PONCE DE LEON** stated that M.E.M.M. exited the front passenger seat of the 2003 grey GMC Yukon, and sat in the back seat on the passenger side. **NAPOLES-PONCE DE LEON** stated that one kilogram was taken out of a backpack inside the 2003 grey GMC Yukon, and that M.E.M.M. cut into the kilogram to show the buyer (the CS) the product. **NAPOLES-PONCE DE LEON** stated that he was standing between the 2003 grey GMC Yukon and the black truck (the 2015 black GMC Sierra) at this time. **NAPOLES-PONCE DE LEON** stated that the kilogram was wrapped in an off white colored plastic bag, and that he walked to the driver's side of the black truck (the 2015 black GMC Sierra) and passed the kilogram in front of **CORNEJO-CERECEDA,** who was seated in the driver's seat, and handed it to the buyer (the CS) who was seated in the passenger seat. **NAPOLES-PONCE DE LEON** stated that all agreed that the second kilogram of cocaine would stay in the 2003 grey GMC Yukon until the $54,000 to purchase the cocaine was produced by the CS.

c.     Post-Arrest Interview of MACIS-ITURRALDE

52.     At approximately 2:45 a.m. on December 11, 2019, your Affiant and SA Campbell conducted a post arrest interview with **MACIAS-ITURRALDE**. **MACIAS-ITURRALDE** was advised of his *Miranda* rights by reading these rights in the Spanish language, acknowledged he understood those rights, and stated he was willing to waive those rights and answer questions

without an attorney present. The following is a synopsis of that interview and is not a comprehensive summary of all statements made or information shared with investigators.

53.     **MACIAS-ITURRALDE** stated that before he was arrested, he was picked up by J.L.C., and that J.LC. had taken him to purchase a $20.00 bag of cocaine. Investigators asked why he had got out of the white van and entered the other vehicle (2003 grey GMC Yukon) at the deal location, and **MACIAS-ITURRALDE** stated because he is an "idiot." **MACIAS-ITURRALDE** was asked if he exited the white van with a backpack and **MACIAS-ITURRALDE** stated that he never possessed a backpack during the events in the parking lot, contrary to the statements of **ORTIZ DE LA FUENTE**.

54.     **MACIAS-ITURRALDE** stated that he knew a cocaine deal would happen inside the 2003 grey GMC Yukon, but that it was just supposed to be for $20 worth of cocaine. Your Affiant told **MACIAS-ITURRALDE** that he had seen him seated in the back seat behind the driver (**ORTIZ DE LA FUENTE**); however, **MACIAS-ITURRALDE** denied sitting there. Your Affiant told **MACIAS-ITURRALDE** that police located a handgun and a large amount of cocaine very close to where **MACIAS-ITURRALDE** was sitting, and **MACIAS-ITURRALDE** stated that he didn't even have any money to purchase large amounts of cocaine. **MACIAS-ITURRALDE** stated that he had no knowledge of the cocaine or the handgun.

d.   Post-Arrest Interview of CORNEJO-CERECEDA

55.     At approximately 3:00 a.m. on December 11, 2019, SA Campbell and your Affiant interviewed Marco **CORNEJO-CERECEDA** was advised of his *Miranda* rights by reading these rights in the Spanish language, acknowledged he understood those rights, and stated he was willing to waive those rights and answer questions without an attorney present. The following is a

synopsis of that interview and is not a comprehensive summary of all statements made or information shared with investigators.

56.     **CORNEJO-CERECEDA** told investigators that he was meeting with his friend "Wachu," later identified as Jesus Alberto **NAPOLES-PONCE DE LEON,** at a job site near the church, and that he intended to pick up a $350 debt that was owed to him by an unknown individual. **CORNEJO-CERECEDA** told investigators that waited in the church parking lot for approximately two hours in order to collect the debt. Surveillance units in the area of the church observed **CORNEJO-CERECEDA** parked in the church parking lot of at least three hours prior to his arrest for the incident offense.

57.     **CORNEJO-CERECEDA** subsequently admitted that he met with individuals in a 2003 grey GMC Yukon that pulled up next to his vehicle, the 2015 black GMC Sierra, and parked. Shortly after this took place, **CORNEJO-CERECEDA** observed two individuals, later identified as Alfonso Alexis **MACIAS-ITURRALDE** and J.L.C., exit a white van that was parked in the area nearby.  **CORNEJO-CERECEDA** stated that he at least observed J.LC. with a backpack in his possession. **CORNEJO-CERECEDA** stated that **MACIAS-ITURRALDE** and J.LC. subsequently got into the 2003 grey GMC Yukon. **CORNEJO-CERECEDA** stated that at some point during this meeting, he was passed a plastic bag by **NAPOLES-PONCE DE LEON**. **CORNEJO-CERECEDA** stated that he subsequently passed that bag to the buyer (the CS). **CORNEJO-CERECEDA** stated he knew a cocaine transaction was occurring but he did not participate in it personally and that he had no role in setting it up or attempting to make sure it was successful. **CORNEJO-CERECEDA** denied knowing that the plastic bag that he handed to the CS contained a kilogram of cocaine.

### IV.  Testing and Weight of Controlled Substances

58.    On December 10, 2019, DEA SA Waugaman conducted a presumptive test on the white powdery substance contained inside the rectangular package found in the 2003 grey GMC Yukon, which indicated presumptive **positive** for the presence of **cocaine**. The package weighed a total of **1184.1 gross grams**.

59.    On December 10, 2019, DEA SA Waugaman conducted a presumptive test on the white powdery substance contained inside the rectangular package found inside the 2015 black GMC Sierra, which indicated presumptive **positive** for the presence of **cocaine**. The package weighed a total of **1334.9 gross grams**.

60.    On December 10, 2019, DEA SA Waugaman conducted a presumptive test on the white powdery substance contained inside the small plastic baggies found in the seatback pocket of the driver's seat of the 2003 grey GMC Yukon, which indicated presumptive **positive** for the presence of **cocaine**. The packages weighed a total of **50.3 gross grams**.

### CONCLUSION

61.    Based on the foregoing, there is probable cause to believe that on or about November 25, 2019, to on or about December 10, 2019, in the State and District of Colorado, the Defendants, (1) Marco Antonio **CORNEJO-CERECEDA,** (2) Jesus Alberto **NAPOLES PONCE DE LEON,** (3) Baldemar Eduardo **ORTIZ DE LA FUENTE,** and (4) Alfonso Alexis **MACIAS- ITURRALDE**, knowingly and intentionally violated 21 U.S.C. § 846 by conspiring together and with unknown co-conspirators to violate federal drug trafficking laws, specifically 21 U.S.C. § 841(a)(1), (b)(1)(B)(vii) (Distribution and Possession with Intent to Distribute 500 grams or more of Cocaine), and further, on or about December 10, 2019, in the State and District of Colorado, the Defendants, (1) Marco Antonio **CORNEJO-CERECEDA,** (2) Jesus Alberto

21

**NAPOLES PONCE DE LEON,** (3) Baldemar Eduardo **ORTIZ DE LA FUENTE,** and (4) Alfonso Alexis **MACIAS- ITURRALDE**, knowingly and intentionally violated 21 U.S.C. § 841(a)(1), (b)(1)(C) (Possession with Intent to Distribute a Controlled Substance (Cocaine), and finally, that on or about December 10, 2019, in the State and District of Colorado, the Defendants (3) Baldemar Eduardo **ORTIZ DE LA FUENTE,** and (4) Alfonso Alexis **MACIAS-ITURRALDE**, knowingly and intentionally violated 18 U.S.C. § 924(c)(1)(A)(i) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime).

I, Ryan P. Donahue, a DEA Special Agent, being duly sworn according to law, hereby state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information and belief.

_s/Ryan Donahue_
Ryan Donahue, Special Agent
Drug Enforcement Administration

Submitted, attested to, and acknowledged by reliable electronic means before me on this 16th day of December, 2019.

BY THE COURT:

HON. KRISTEN L. MIX
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

**Affidavit reviewed and submitted by Assistant United States Attorney Conor A. Flanigan.**

22